IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WESLEY JACOBS, | ) | CASE NO. 5:19CV466 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| SECURITAS ELECTRONIC SECURITY, INC., | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This case is before the undersigned for a report and recommendation on Defendant Securitas Electronic Security's ("Securitas") motion for temporary restraining order ("TRO Motion") filed on April 9, 2019.  Doc. 5.[1]  Plaintiff Wesley Jacobs ("Jacobs") filed a response on April 10, 2019, Doc. 8, and the undersigned held a telephone conference with counsel on April 10.[2]

For the reasons explained below, the undersigned recommends that the Court GRANT in part and DENY in part Securitas' TRO Motion.  Specifically, the undersigned recommends that the Court GRANT the TRO Motion insofar as it seeks to restrict Jacobs from working directly or indirectly with clients he worked with during the last year of his employment with Securitas or with prospective clients of Securitas that he was assigned to solicit business from during that period.  In addition, the undersigned recommends that Jacobs be enjoined from disclosing or utilizing proprietary information or soliciting any employee or agent of Securitas to terminate employment with Defendant.  The undersigned recommends that the Court DENY the TRO

---

[1] Securitas seeks both a TRO and preliminary injunction.  However, only the TRO Motion has been referred to the undersigned.  Doc. 7.

[2] During the conference, the parties were directed to continue settlement discussions they had begun previously and to file a Joint Status Report by April 12.  Doc. 10.  The Joint Status Report filed on April 12 indicated that the parties were unable to reach agreement.  Doc. 11.

Motion to the extent it would prevent Jacobs from working for Defendant's competitor, Convergent, in any capacity.

## I. Background

Defendant Securitas is "a security-systems integrator and security-monitoring provider, which sells, installs, operates, and monitors various products, systems, and services, including software solutions." Doc. 4, p. 11, ¶4. On June 11, 2018, Securitas purchased a company called Kratos,[3] where Jacobs had worked as an account executive since December 2011. Doc. 1, p. 2, ¶¶6, 11. At Kratos, Jacobs was paid commissions and was given access to customer and sales data, which allowed him to confirm that he had been paid all commissions due. Doc. 1, p. 2, ¶10; Doc. 4, p. 17, ¶28.

When Securitas purchased Kratos, Jacobs became an employee of Securitas. In September 2018, Securitas required Jacobs to sign a noncompetition and non-solicitation agreement (hereinafter, "Agreement") in order to continue to earn commissions on his existing customers. Id., ¶11. The Agreement reads, in pertinent part:

> [E.] 3. <u>Non-Disclosure</u>. In exchange for the Associate's receipt and use of the Company and/or its Related Companies' Proprietary Information . . ., and in consideration of the Associate's employment or continued employment with the Company and the compensation and benefits arising from that employment or continued employment . . . , the Associate agrees not to directly or indirectly, either during employment with the Company or thereafter, use or disclose Proprietary Information to or for the benefit of any person not authorized by the Company to receive or benefit from such Proprietary Information.. . .[4]

---

[3] The parties appear to disagree as to the exact corporate name of the company Securitas purchased (See Doc. 4, p. 17, ¶28; Doc. 1, p. 2, ¶6). For purposes of this R&R, the distinction is not material. For convenience, the Court refers to the company as "Kratos."

[4] The Agreement defines "Proprietary Information" as:
[I]nformation possessed by the Company or its Related Companies, whether developed by the Associate or otherwise, that is not generally known publicly and that has value, gives the Company or its Related Companies a competitive advantage or otherwise qualifies as a "trade secret" under applicable laws. Proprietary Information includes information that has been provided to the Company or its Related Companies by a third party, including but not limited to Company's and its Related Companies' customers, and that is subject to restrictions on disclosure and/or use ("Third Party Confidential Information.") Proprietary Information will generally include, but is not limited to, research, software, engineering drawings, service documentation, competitive intelligence, supplier names and data, customer information,

2

> \* \* \*
>
> [F.] 4. <u>Non-Competition Post-Termination</u>.  For a period of one (1) year following the Associate's termination from employment with the Company, . . ., the Associate shall not, within the employee's assigned market area, where the Company or any of its Related Companies market, sell, install, operate, monitor, or maintain their products, systems or services, engage in any Competing Business Activity . . . regarding any product, service, system, or business for which the Associate had any responsibility during the last two (2) years of his or her employment with the Company.[5]
>
> \* \* \*
>
> 5. <u>Non-Solicitation of Customers</u>.  If the Associate's duties . . . involve selling . . ., then for a period of one (1) year following the Associate's termination of employment from the Company, . . . the Associate shall not: (a) directly or indirectly solicit, or assist others in soliciting business from any Restricted Customer . . . ; or(b) in any manner make, attempt to make, or assist others in making Sales of products or services that are in competition with the Company's products or services to any Restricted Customer."[6]

Doc. 1-1, pp. 4-5.

Jacobs' job title at Securitas was "Strategic Accounts Manager." Doc. 4, p. 16, ¶23. In about October 2018 through March 15, 2019, his title changed to "Senior Account Executive – National Financial Sales." Doc. 4, p. 16, ¶23. Securitas states that, in both roles, "Jacobs was primarily responsible for executing sales and marketing strategies to achieve sales goals for

---

> business strategies, planned acquisitions or divestitures, quotations, discounts, data compilations, items marked as "confidential", "secret", "proprietary", or "privileged", and any other information the Company has not publicly disseminated. In the event the Associate is unsure if something is to be treated as Proprietary Information, the Associate shall treat it as such until expressly advised otherwise by an officer of the Company.

Doc. 1-1, p. 3.

[5] "Competing Business Activity" is defined as follows:
> Competing Business Activity" means any actions that are the same as or are substantially similar to any actions the Associate performed as an employee of the Company, for or with any person, organization, or entity that markets, sells, installs, operates, monitors, or maintains any product, system or service that is competitive with any product, system or service, or other business endeavor of the Company or its Related Companies.

Doc. 1-1, p. 5.

[6] "Restricted Customer" is defined as:
> any actual or prospective customers of the Company or its Related Companies to which, at any time in the twelve (12) months preceding the Associate's last day of employment . . ., the Associate: (i) sold, negotiated the sales, or promoted products, systems or services on behalf of the Company or its Related Companies; (ii) marketed or provided support on behalf of the Company or its Related Companies; or (iii) about which the Associate obtained proprietary information.

Doc. 1-1, p. 5.

Securitas products and services, including supporting Securitas customers, proposing Securitas solutions that would meet customer requirements, leading customer discussions and negotiations to secure sales, and ensuring successful post-sale implementation and follow-up." Doc. 4, pp. 16-17, ¶24. He had large accounts in the United States and Canada assigned to him. Counsel indicated, during the telephone conference with the Court, that Jacobs' principal client, during the last year of his employment with Securitas and Kratos, was JPMorgan Chase. See also id., ¶26.

Jacobs was the primary point of contact for accounts assigned to him, and, Securitas alleges, had access to confidential and proprietary information, including information concerning current and potential customers, accounts, sales, costs, suppliers, processes, and pricing. Id., ¶27. Counsel for Securitas explained that, in addition to Jacobs' assigned client JPMorgan Chase, Jacobs was part of Securitas' national financial sales team, which discussed other large financial institutions that were prospective clients. See also Doc. 11, p. 4.

Jacobs alleges that he performed the same job for Securitas that he did for Kratos, he had the same customers, and he was not given "any new information whatsoever since he began his employment with Securitas, and certainly no new 'Proprietary Information.'" Doc. 1, p. 4, ¶22. He asserts that Securitas substantially reduced his earned commissions on his existing clients and took away several customer accounts that he had developed when he worked for Kratos, prior to Securitas purchasing Kratos. Id., ¶¶24-25. As a result, Jacobs alleges, he was left with a smaller customer base and a reduced ability to earn commissions; he also alleges that Securitas has engaged in a variety of acts that have caused it to underpay or avoid paying him commissions that are due him. Id., ¶¶25, 27-29.

On March 1, 2019, Jacobs left Securitas and began working in a similar capacity for Convergint, a competitor of Securitas. Id., p. 5, ¶33. Counsel indicated that his work for

Convergint involves only clients located in the United States.

Jacobs filed a Complaint alleging breach of contract and seeking contractual remedies for Securitas' alleged failure to pay him commissions; he also requested a judgment declaring that the Agreement is unenforceable. Doc. 1. Securitas filed an Answer and Verified Counterclaim (Doc. 4) and the TRO Motion, in which it seeks to enjoin Jacobs from violating the terms of the Agreement. Doc. 5.

## II. Legal Standard

### A. TRO standard

"[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Reid v. Hood*, 2011 WL 251437, at *2, (N.D. Ohio Jan. 26, 2011) (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). TROs expire "at the time after entry—not to exceed 14 days—that the court sets" unless extended by the court for good cause or by consent of the enjoined party. Fed. R. Civ. P. 65(a)(2).

The standard for issuing a TRO is the same as for a preliminary injunction; however, the emphasis is on irreparable harm "given that the purpose of a temporary restraining order is to maintain the status quo." *Reid*, 2011 WL 251437, at *2 (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2, (1977)).

When determining a motion for TRO, courts consider whether the moving party meets its burden in establishing the following four factors: 1) whether the moving party has a strong or substantial likelihood of success on the merits; 2) whether the moving party will suffer irreparable harm unless injunctive relief is granted; 3) whether the requested relief will cause substantial harm to third parties; and 4) whether injunctive relief is in the public interest. *Northeast Ohio Coal. for Homeless and Service Emps. Int'l Union v. Blackwell*, 467 F.3d 999

(6th Cir. 2006); *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). "These factors are not prerequisites but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id*. (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

### B. Ohio law

Under Ohio law, a non-compete agreement is enforceable only to the extent its terms are reasonable. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 270 (Oh. Ct. App. 2000). A non-compete is reasonable if three conditions are met: (1) it goes no further than necessary to protect the legitimate interests of the employer; (2) it does not impose undue hardships on the employee; and (3) it is not injurious to the public. *FirstEnergy Solutions Corp. v. Flerick*, 521 Fed. App'x 521, 525-526 (6th Cir. 2013) (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)). The three factors summarize the following nine factors enumerated in *Raimonde*:

1. Whether the restriction is temporally and spatially limited;

2. Whether the employee represents the sole contact with the customer;

3. Whether the employee is possessed with confidential information or trade secrets;

4. Whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition;

5. Whether the covenant seeks to stifle the inherent skill and experience of the employee;

6. Whether the benefit to the employer is disproportional to the detriment to the employee;

7. Whether the covenant operates as a bar to the employee's sole means of support;

8. Whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and

6

9. Whether the forbidden employment is merely incidental to the main employment. *FirstEnergy Solutions*, 521 Fed. App'x at 526.

The party seeking to enforce a non-compete agreement must establish the foregoing elements by clear and convincing evidence. *Id*. at 526 (citing *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007)); *Clark v. Mt. Carmel Health*, 706 N.E.2d 336, 340 (Oh. Ct. App. 1997).

The reasonableness of a noncompete agreement is determined on a case-by-case basis. If the Court determines that the terms of a noncompete are unreasonable, the Court is charged with modifying the terms so as to make them reasonable. *FirstEnergy Solutions*, 521 Fed. App'x at 526 (citing *Raimonde*, 325 N.E.2d at 547); *Rogers v. Runfola & Assocs., Inc*., 565 N.E.2d 540, 543 (Ohio 1991).

### III. Analysis

**A. Securitas has shown it is entitled to injunctive relief**

**1. Likelihood of success on the merits**

Securitas argues that it is likely to succeed on the merits. Doc. 5, p. 9. It asserts that the Agreement is enforceable, reasonable, and prohibits Jacobs from performing similar work for Convergint. Jacobs contends that the Agreement is unenforceable and unreasonable. Doc. 8, pp. 1-2, 7-10. He asserts that the Agreement is too broad in scope both geographically and in the manner it defines prohibited business activity. Doc. 8, p. 7. He complains that the Agreement unreasonably seeks to prohibit him from soliciting business from clients he procured when working for Kratos, Securitas' predecessor. Doc. 8, p. 8. He also contends that the Agreement fails for lack of consideration and is unconscionable because he was forced to sign it to maintain his employment. Doc. 8, pp. 8-9. Lastly, he asserts that Securitas has breached the Agreement

7

by failing to pay him commissions, excusing him from performance of the Agreement. Doc. 8, p. 10.

Considering the *Raimonde* factors, the Court finds that the Agreement's restrictions are generally reasonable temporally and spatially, although some of the terms ultimately may be determined to be overly broad so as to require modification.[7] The Agreement restricts Jacobs for one year after his employment and is limited to Jacobs' assigned market area. *FirstEnergy Solutions*, 521 Fed. App'x at 526 (one-year limit and geographical scope of the area where the company does business is reasonable). Although Jacobs' assigned market was broad—the United States and Canada—Securitas' business is nationwide and involves large financial institutions that have a North American presence. Thus, the geographical scope is reasonable.[8] *See e.g., Try Hours, Inc. v. Douville*, 985 N.E.2d 955, 965–966 (Ohio Ct. App. 2013) (nationwide scope reasonable and necessary in the multi-state, nationwide trucking industry).

Next, Jacobs' assertion that the Agreement is unreasonable because it prevents him from soliciting customers that he developed when he worked for Kratos is not persuasive because Securitas purchased Kratos and the purchase included the carryover of employees such as Jacobs and the business and proprietary information they had developed for Kratos. Jacobs' assertion that there was a lack of consideration for the Agreement also fails. *See Lake Land Emp't. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 31 (Ohio 2009) (a noncompete agreement presented by an employer to an existing employee to sign as a condition for continued employment is supported by consideration). Jacobs' contention that Securitas breached the Agreement by failing to pay him commissions, excusing his performance of the Agreement, requires discovery

---

[7] For example, the Non-Competition Post-Termination provision and its definition of "Competing Business Activity," which are quoted above, could be read so as to completely prevent Jacobs from working for Convergint.

[8] During the telephone call with the Court, counsel indicated that they do not believe Convergint has assigned Jacobs to work with customers in Canada.

and development of the evidence, as Jacobs' counsel admitted during the telephone call with the Court. None of these arguments, therefore, are persuasive with respect to the TRO Motion.

Securitas asserts that Jacobs had access to its confidential information such as its pricing scheme, business strategy, and prospective customers. Doc. 5, p. 10. Jacobs disagrees that he had any confidential information. Doc. 8, p. 1. He states that any "customer information" he had he obtained while working for a "former employer." Doc. 8, p. 1. But he obtained the customer information while working for Kratos; the information became Securitas' information when Securitas bought Kratos. Thus, the Court finds that Jacobs likely has at least some confidential customer information belonging to Securitas. *See Raimonde*, 325 N.E.2d at 547 (a court considers whether the employee is possessed with confidential information).

Jacobs argues that the Agreement is unreasonable because it is too broad in the way it defines the prohibited business activity. He contends that the Agreement arguably would prohibit him from working for Wal-Mart. Doc. 8, p. 7. However, Jacobs does not allege that Wal-Mart sells security systems or services to large financial institutions, i.e., Wal-Mart is not a company substantially similar to Securitas and Convergint. See Doc. 1-1, p. 5 (Agreement defining "competing business activity" as "actions that are the same or substantially similar to any actions the Associate performed as an employee of the Company, for or with any ... entity that markets ... any product ... or service that is competitive with" products or services of Securitas). Although the language in the Agreement is broad, it is not so broad to be unenforceable.

In sum, the Agreement is generally reasonable in scope and, based on the facts currently before the Court, enforceable. Therefore, Securitas has shown that it has a substantial likelihood of success on the merits.

### 2. Irreparable harm

A party's "harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citation omitted).  "[A]an injury is not fully compensable by money damages if the nature of the [moving party's] loss would make the damages difficult to calculate." *Id*. (citations omitted).  Securitas claims that it will suffer a loss of customer goodwill if the Agreement is not enforced.  Under Ohio law, the "likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate,", i.e., it is irreparable.  *Id*. (citation omitted).

Securitas also asserts that it will suffer irreparable harm if the injunction is not granted because Jacobs "was privy to considerable customer and business proprietary information and was the contact person for a number of key national customers, including JPMorgan Chase."  Doc. 5, p. 13.  If Jacobs shares the information with Convergint, Securitas alleges, it will be harmed irreparably.  Doc. 5, p. 14.

The only specific information Securitas has identified as being in Jacobs' possession that it believes would cause it irreparable harm if disclosed is its "pricing worksheet for JPMorgan Chase," which it implies may be relevant to requests for proposals ("RFPs") that it believes JPMorgan will soon be issuing.  Doc. 4, p. 18, ¶38.  Jacobs counters that JPMorgan already has a list of the prices of the products it purchases from Securitas and that prices in proposals always change.  Doc. 8, p. 11. Counsel for Securitas indicated during the telephone conference with the Court that the "pricing worksheet" is confidential because it reflects not only the prices that Securitas charged JPMorgan but also Securitas' costs, which were a basis for the pricing.  Counsel for Securitas acknowledged that prices and pricing-related information change over time.  Doc. 5, p. 13.  However, Jacobs' argument that JPMorgan has a price list for the products

and services it purchased from Securitas misses the point; the point is that Convergint may learn the prices and the cost basis for those prices from Jacobs and that may provide an unfair competitive advantage to Convergint in bidding on JPMorgan Chase business. Thus, Securitas has provided evidence of irreparable harm.[9]

### 3. Substantial harm to third parties

Securitas asserts that no third parties will be harmed if injunctive relief is granted. Doc. 5, p. 14. Jacobs argues that he will be harmed because he will be forced out of his position at Convergint and be unemployed. Doc. 8, p. 12. However, as set forth below, the recommended TRO is narrowly tailored to prohibit Jacobs from working only with certain clients, not with all Convergint clients, such that Jacobs will still be able to perform work for Convergint. *See also FirstEnergy Solutions*, 521 Fed App'x at 529 (finding no harm to the employee who signed the non-compete agreement because he did so with full awareness of the limitations it contained).

### 4. Public interest

"[T]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *Id.* (citing *National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 891 (N.D.Ohio 1996). Because the Court finds that the Agreement is a valid restrictive covenant, this factor weighs in favor of Securitas.

In sum, the undersigned finds that the Agreement is enforceable and that Securitas has established that it is entitled to a TRO, outlined in detail below.

---

[9] Jacobs finds fault with Securitas for waiting until April 9 before filing its TRO Motion, implying that its delay means that harm to Securitas is not irreparable. Doc. 8, p. 12. But, as counsel for both sides explained during the telephone call with the Court, the parties had had numerous telephone and email exchanges in an attempt to resolve the need for a TRO, including a redlined version of a proposed agreement emailed on April 8, but these talks failed. The Court does not find fault with the timing of Securitas' TRO Motion when it was attempting to resolve this dispute prior to seeking court intervention.

11

**B. Bond**

Civil Rule 65 states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the rule states the requirement in mandatory terms, the Sixth Circuit has held that district courts possess discretion over the posting of bond. *Ohio State Univ. v. Thomas*, 738 F.Supp.2d 743, 757 (S.D. Ohio 2010) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)).

Securitas argues that a bond is not necessary. Jacobs does not respond to this argument. The undersigned finds that a bond is necessary and appropriate and recommends that the bond be set in an amount equivalent to two weeks' earnings for Jacobs at his current employer, i.e., his earnings during the period of the TRO, and that the bond remain in effect during the TRO period. *See, e.g., Safety Today, Inc., v. Roy*, 2012 WL 13027422 (S.D.Ohio Aug. 14, 2012) (calculating a bond for a TRO based on potential salary lost by employee). Jacobs should be directed to file with the Court a statement as to the dollar amount of his earnings for a two-week period.

## IV. Conclusion

For the reasons explained above, in order to preserve the status quo pending a hearing on Securitas' Motion for Preliminary Injunction, the undersigned recommends that Jacobs be prohibited from violating the terms of the Agreement by:

(1) Disclosing or utilizing any Proprietary Information as defined in the Agreement that he learned during his employment with Securitas or its predecessor, Kratos;

(2) Communicating or assisting others in communicating with any customer of Securitas as to which Jacobs had any sales or client relations responsibility during the last 12 months of his

employment with Securitas or its predecessor;[10]

 (3) Communicating or assisting others in communicating with any entity that was a prospective client of Securitas or its predecessor during Jacobs' last 12 months of employment and as to which Jacobs was assigned responsibility for soliciting business or for assisting others in doing so; and

 (4) Directly or indirectly soliciting or inducing any employee, officer, or agent of Securitas, or any of its Related Companies, to terminate employment therewith.

 As discussed above, it is recommended that bond be sent in amount equivalent to two weeks of Jacobs' earnings at his current employer.

Dated: April 16, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[10] The Agreement provides that Jacobs is prohibited, for one year following the termination of his employment with Securitas, from engaging in any competing business activity regarding any product or service for which he had any responsibility during the last two years of his employment. Doc. 1-1, p. 5, ¶4. However, Securitas' proposed order seeks to prohibit Jacobs from engaging in the prescribed activity for which he had any responsibility during the last 12 months of his employment. Doc. 5-1, p. 2, ¶4. Thus, the undersigned recommends that the TRO cover the last 12-month period.