IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WESLEY JACOBS, | ) | CASE NO. 5:19CV466 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| SECURITAS ELECTRONIC SECURITY, INC., | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This is a dispute over a noncompete agreement.  Plaintiff Wesley Jacobs ("Jacobs") is a former senior account executive for Defendant Securitas Electronic Security, Inc. ("Securitas"); Securitas sells electronic security systems/solutions to commercial customers, including those in the financial sector.  Jacobs, who is now employed by a competitor of Securitas, seeks to void his noncompete while Securitas seeks to enforce it.  Securitas filed a Motion for Temporary Restraining Order and Preliminary Injunction.  Doc. 5.  The Court granted the TRO Motion in part on May 6, 2019.  Doc. 17.  The case is now before the undersigned for a report and recommendation on Securitas' Motion for Preliminary Injunction ("PI Motion").[1]

An evidentiary hearing was held on June 14, 2019, and the parties submitted post-hearing briefs.  Docs. 45, 46, 47.  Also pending is the parties' Joint Motion to Admit Evidence and to Redact Certain Exhibits (Doc. 48), which is addressed in a separate order.

For the reasons explained below, the undersigned recommends that the Court GRANT in part and DENY in part Securitas' PI Motion.  Specifically, the undersigned recommends that the Court GRANT the PI Motion by maintaining the restrictions set forth in the TRO.  The TRO

---

[1] By agreement of the parties, the TRO remains in effect through the completion of preliminary injunction proceedings.  Doc. 22.

1

enjoins Jacobs from selling to, or otherwise working directly or indirectly with, clients he worked with during the last year of his employment with Securitas;[2] with prospective clients of Securitas that he was assigned to solicit business from during that period; from disclosing or utilizing any proprietary information that he learned during his employment with Securitas or Kratos; and from soliciting any employee or agent of Securitas to terminate employment with Defendant.

The undersigned recommends that the Court DENY the PI Motion insofar as it seeks to greatly expand the relief provided in the TRO by enjoining Jacobs from selling to any of the nation's 20-25 largest national financial institutions that Securitas sells to or targets as prospective customers through its "national financial vertical" sales team.[3] Securitas has not shown that Jacobs' working with such clients violates any provision of his non-compete, i.e., it has failed to meet its burden to show a strong likelihood of success on the merits with respect to such customers or potential customers other than J.P. Morgan Chase ("Chase"), which Jacobs is prohibited from selling to under the terms of the TRO.

## I. Background

Many of the background facts have been set forth in the Court's Memorandum Opinion and Temporary Restraining Order and in the undersigned's Report and Recommendation on Securitas's TRO Motion (see Docs. 13, 17) and will not be reiterated herein, other than to briefly summarize the relevant facts. Certain additional facts that were developed during the preliminary injunction hearing and briefing will also be set forth.

---

[2] "Securitas" for this purpose also includes Kratos Public Safety and Security Solutions ("Kratos"), which previously employed Jacobs. Securitas acquired Kratos in June 2018. Doc. 44, p. 4-5.

[3] It its proposed preliminary injunction order, Securitas lists 21 banks by name that it wishes to bar Jacobs from dealing with. Doc. 47-1, p. 2, ¶2. However, during the preliminary injunction hearing, no witness identified by name all the banks Securitas considers part of its national financial vertical. Rather, Securitas's witnesses referred to "20-25" financial institutions. See, e.g., Doc. 44, p. 95. See also id, p. 19 (Securitas's Senior VP for Financial Sales stating "I'm not sure of the exact number, somewhere between 20, 25 banks . . . .")

Prior to June 2018, Jacobs worked for Kratos selling electronic security systems. Doc. 44, pp. 117-118. Securitas purchased Kratos in June 2018 and Jacobs became a Securitas employee. Doc. 44, pp. 4-5, 19. At both companies, Jacobs received a base salary and commissions. Doc. 44, p. 119.

Jacobs has been in the security systems industry since 1995. Doc. 44, p. 117. Since 1999, he has been the relationship/account manager for Chase at the companies he has been employed with. Doc. 44, p. 118. With Kratos, he serviced clients in a number of different sectors. Doc. 44, p. 118. For instance, from about March 2018 to March 2019, his client list included, in addition to Chase, at least sixteen customers and/or general contractors in other sectors, such as Volvo, General Electric, and Florida International University. Doc. 44, pp. 136-139.

Securitas is in the business of selling security systems or solutions to various industry sectors, including the financial sector. Securitas is not a manufacturer. The systems/solutions it sells consist of a combination of hardware, software, and services obtained from other suppliers that Securitas bundles together with services it supplies, e.g., installation, monitoring, maintenance, into a complete package adapted to meet the specific requirements and applications of individual customers. See, e.g., Doc. 44, pp. 10-12, 17-18. Shortly after Securitas acquired Kratos, and as a result of Jacobs' pre-existing relationship with Chase, it made him part of its "national financial vertical" sales team, whose mission was to sell security services to the 20-25 largest national banking institutions. Doc. 44, p. 19. Jacobs was ordered to devote all of his efforts to increasing business with Chase[4] and was instructed to transfer the other customers he had serviced while at Kratos to other salespeople. Doc. 44, pp. 20, 43, 118, 122-123; Plaintiff's

---

[4] In an email to Jacobs, Robert Raymond, Securitas' Senior Vice President of Financial Sales to whom Jacobs reported, said "Your focus is 100% JPMC Corp...." Plaintiff's Ex. A.

3

Ex. A, T.

Securitas also conditioned Jacobs' ability to earn future commissions upon his signing a Restrictive Covenant Agreement "the Agreement," *i.e.*, a noncompete, and a new commission plan. Doc. 44, pp. 32, 58. Securitas' commission plan was different from Jacobs' prior commission plan with Kratos. Doc. 44, p. 121. Under the Kratos plan, Jacobs earned commissions on each "job" performed for each client. Doc. 44, pp. 59, 77-78, 118, 121. Under the new Securitas plan, Jacobs earned commissions based on his performance against a quota that would be set for him by Securitas. Doc. 44, p. 78.

Jacobs was unhappy with Securitas' commission plan. Doc. 44, pp. 32, 120-121.[5] He also was concerned about the Agreement; he had never had a non-compete before. Doc. 44, pp. 31-32, 120.[6] Albeit reluctantly, Jacobs signed the Agreement and the Securitas commission plan on September 21, 2018. See Joint Exhibits 5, 7.

In March 2019, Jacobs resigned from Securitas. Doc. 44, pp. 96, 147. Shortly thereafter, he began working for Convergint. Convergint is a competitor of Securitas. Doc. 44, pp. 28-29. At Convergint, he sells electronic security systems to Convergint's national financial vertical, which Jacobs testified includes 400 banks. Doc. 44, pp. 132, 134, 156-157. Jacobs has not worked with Chase at Convergint. Doc. 44, p. 134. He has been working on developing business with PNC Bank ("PNC"). Doc. 44, p. 164. PNC is one of the 20-25 banks included in Securitas' national financial vertical. Doc. 44, p. 25. It is undisputed that Jacobs did not work with, or sell to, PNC, when he was employed by Securitas. At the time of the preliminary injunction hearing, Securitas and Convergint were competing with respect to access control

---

[5] Jacobs was concerned that his commissions would be reduced since customers had been taken away from him and because he was not being told what his quota for 2019 would be. Doc. 44, pp. 120-123.

[6] The relevant terms of the Agreement are quoted in full in the undersigned's Report & Recommendation on the TRO Motion, Doc. 15, and they are also quoted in pertinent part below.

4

system proposals that they were presenting to PNC.[7]

## II. The Parties' Contentions

In its post-hearing brief, Securitas argues that Jacobs has violated the Agreement in a number of ways and will continue to do so unless enjoined from selling to any of the large banks that comprise Securitas' national financial vertical. Securitas says that Jacobs is violating Paragraph F.4 of the Agreement (Non-Competition Post-Termination) because he "is working for a direct competitor, Convergint, providing the same or substantially similar services in his assigned market area—namely . . . the national financial vertical . . . ." Doc. 47, p. 12. Second, Securitas says Jacobs must be "barred from soliciting the national financial banks for a period of one year under Paragraph F.5" (Non-Solicitation of Customers) because he "learned proprietary information about how Securitas obtained or was implementing strategies to obtain business from the national financial market . . . ." Doc. 47, p. 13. Third, Securitas says Jacobs has violated the Agreement's confidentiality restriction[8] because he recommended that Convergint include as an option in its proposal to PNC a service provider that he "gained experience and knowledge about" while at Securitas." Doc. 47, p. 13.[9]

Jacobs disputes the enforceability of the Agreement, arguing, inter alia, that he is released from his duties under it and/or that Securitas may not enforce it against him because Securitas failed to pay him all commissions he was owed. He also argues that he is not breaching the Agreement because he is not working with any of his former Securitas customers; he has no

---

[7] Raymond stated, "we're in the midst of a[n] RFP right now where [PNC is] potentially going to keep us or maybe make a changes [sic] and Convergint is heavily involved in that." Doc. 44, p. 28. Jacobs agreed that he has been working on a PNC proposal on behalf of Convergint. Doc. 44, pp. 164-166.

[8] Although Securitas does not say so, this appears to be a reference to Paragraph E.3 (Non-Disclosure).

[9] Securitas also says that Jacobs has breached the Agreement by failing to promptly return company property, i.e., certain hard drives. Doc. 47, p. 13. Although Securitas does not say so, this appears to be a reference to Paragraph E.4 (Company Property). Jacobs testified that he no longer has the hard drives, having turned them over to his attorney (Doc. 44, p. 148) and Securitas does not specifically refer to the hard drives in its Proposed Order.

proprietary information about any banks in Securitas' national financial vertical except Chase; and he has not used or disclosed the Chase information. Doc. 46, p. 6.

### III. Legal Standard

The Sixth Circuit recently reiterated the four factors the Court is to weigh in ruling on a motion for preliminary injunction:

> Courts reserve the extraordinary remedy of a preliminary injunction for those cases where it is necessary to preserve the status quo pending a final determination of the merits. *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). In deciding whether to issue an injunction, a district court weighs four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 849 (6th Cir. 2017) (quotation omitted).

*Louisiana-Pacific Corp. v. James Hardie Building Prods*., 928 F.3d 514, 517 (6th Cir. June 28, 2019). The Sixth Circuit also highlighted the importance of the likelihood of success factor:

> As long as a plaintiff demonstrates some likelihood of success on the merits, a court should balance rather than tally these factors. *Id*. But our cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success. *Id*.; *see also Winnett v. Caterpillar, Inc*., 609 F.3d 404, 408 (6th Cir. 2010).

*Id*.

Because Ohio law governs the parties' dispute, Ohio law also guides the determination whether a movant has shown a strong likelihood of success on the merits. *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 849 (6th Cir. 2017). Under Ohio law, a noncompete agreement is enforceable only to the extent its terms are reasonable. *Procter & Gamble Co., v. Stoneham*, 747 N.E.2d 268, 270 (Oh. Ct. App. 2000). A non-compete is reasonable only if it (1) goes no further than necessary to protect the legitimate interests of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *First Energy Solutions Corp. v. Flerick*, 521 Fed. App'x 521, 525-526 (6th Cir. 2013)

(citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)). A former employer seeking a preliminary injunction to enforce a noncompete must show its right to such relief by clear and convincing evidence. *Chicago Title Ins. Co. v. Regal*, 2009 WL 10688286, at *5 (N.D.Oh. May 26, 2009) (citing *White v. Long*, 231 N.E.2d 337, 340 (Ohio 1967)).

## IV. Analysis

The Court has previously set forth its analysis and conclusions regarding the application of the four preliminary injunction factors to the relief granted in the TRO. That analysis has not changed. Accordingly, the analysis in this Report and Recommendation pertains primarily to the relief sought by Securitas in the PI Motion that goes beyond the relief granted in the TRO.

### A. Likelihood of Success

There are four principal contested issues regarding the application of the likelihood of success factor with respect to the PI Motion, two going to the enforceability of the Agreement and two going to the scope of the injunctive relief sought. The enforceability issues are (1) whether the Agreement is enforceable at all; and (2) whether Jacobs is bound by the Agreement and/or whether Securitas is precluded from enforcing it because it failed to pay him all the commissions he was owed. The two issues going to the scope of the Agreement and the injunctive relief sought are (3) what was Jacobs' "assigned market area" under Paragraph F.4 of the Agreement; and (4) whether Jacobs is using Securitas' proprietary information while working for Convergint in violation of Paragraphs F.5 and E.3.

**1. The Agreement is enforceable**

Jacobs argues that the Agreement is unenforceable. Doc. 46, p. 3. His arguments in this regard are that the Agreement is unconscionable because he was forced to sign it and is unreasonable because it contains no geographical or customer limitations on its scope. Doc. 46, pp. 7-9. These are the same arguments he advanced regarding this issue in opposing the TRO

7

Motion; they were rejected by the Court.  Nothing in the preliminary injunction hearing record rescues them.  For example, with respect to the coercion argument, Jacobs admitted during his hearing testimony that he did not have to sign the Agreement:

> Q. You would agree with me that you did not have to sign the restrictive covenant agreement?
> A. You're correct. I could have walked away.
> Q. Nobody forced you to sign it?
> A. The only force was if I wanted to get paid commissions on that, I needed to sign this document.
> Q. But you could have chosen to forgo that?
> A. I could have, yes.

Doc. 44, p. 143.

For the reasons stated previously by the Court (Docs. 13, 17), the undersigned recommends finding that the Agreement is enforceable; Jacobs has not shown that the Agreement is unconscionable or that it is facially unenforceable.

### 2. Securitas' failure to pay Jacobs some commissions does not preclude it from enforcing the Agreement.

Jacobs asserts that Securitas breached the Agreement by failing to pay him all the commissions he was owed under the Kratos commission plan.  Doc. 46, p. 1.  The undersigned finds that the evidence presented at the hearing is insufficient to support Jacobs' argument that Securitas should be precluded from enforcing the Agreement against him.

During the expedited discovery period preceding the preliminary injunction hearing, Jacobs identified 210 jobs he believes he was shortchanged on.  The 210 jobs were booked while Jacobs was under the Kratos commission plan.  Doc. 44, p. 83.  The undersigned permitted Jacobs to select 25 of those jobs and to obtain all backup documents regarding them.

It is undisputed that Securitas assumed responsibility for paying commissions due under the Kratos plan when it acquired Kratos and that it did pay Jacobs commissions under both plans.  Doc. 44, pp. 58-59.  Also undisputed is that, from July 2018 to April 2019, Securitas paid Jacobs

8

a total of $390,688.32 in commissions. Doc. 44, p. 63. The results of Jacobs' and Securitas' review and analysis of the detailed discovery regarding the 25 jobs was the subject of testimony by Securitas' Senior financial analyst, Kyle Wagner. His analysis showed a maximum potential shortfall of $4,700. Doc. 44, pp. 76, 83. In other words, Securitas failed to pay Jacobs about $4,700 in commissions, or about 1.2% of the commissions he earned over a 9-month period.

Under Ohio case law cited by Jacobs, a party seeking to enforce a contract must show substantial performance on its part. *South Texas & Lone Star Drywall, Inc., et.al., v. Young*, 1977 WL 200617 (Ohio Ct. App. Dec. 6, 1977). The undersigned concludes that the evidence presented at this stage of the litigation regarding Securitas' failure to pay Jacobs 1.2% of his commissions does not rise to the level of a material breach that would preclude Securitas from enforcing the Agreement. While it may be true, as Jacobs argues, that review of detailed backup records pertaining to the remaining jobs he alleges he was not fully paid on may prove that Securitas owes additional commissions, the undersigned declines to speculate as to what future discovery and a trial on the merits may reveal.

### 3. Paragraph F.4: Jacobs' Assigned Market Area

Securitas contends that Jacobs is violating Paragraph F.4. of the Agreement, which states, in relevant part,

> the Associate shall not, <u>within the employee's assigned market area</u>, where the Company or any of its Related Companies market, sell, install, operate, monitor, or maintain their products, systems or services, engage in any Competing Business Activity....

Joint Ex. 5, p. 5, ¶4 (emphasis added).

In its post-hearing brief, Securitas argues that Jacobs' "assigned market area" under Paragraph F.4. is defined by Securitas' commission plan as being the 20-25 banks in its national financial vertical. Doc. 47, p. 6.

9

Securitas' argument fails for a number of reasons.  First, the Agreement itself does not define the term "the employee's assigned market area," nor does it refer to the commission plan as defining that term.  Second, Securitas' commission plan does not use the words "assigned market area," as Securitas suggests (Doc. 47, p. 6).  Rather, it defines the phrase "sales territories."  Joint Ex. 7, p. 5.  Listed in the definition of "sales territories" are: "defined geographical areas," "named accounts," and "groupings of products, customers, prospects, and vertical markets," as assigned by the Senior Vice President of Sales or the President.  Joint Ex. 7, p. 5.

Securitas' evidence showed that, during the time Jacobs was a member of the national financial vertical sales team, he was <u>not</u> assigned to sell to all banks that were customers or potential customers of that team.  Rather, it shows that Jacobs was restricted to one customer, Chase, and he was forbidden to pursue other prospects.  Indeed, he was stripped of the customers other than Chase that he previously sold to.  Robert Raymond, Securitas' Senior Vice-President for Financial Sales to whom Jacobs reported, testified that Jacobs was assigned only to Chase:

> Q. When Mr. Jacobs was a member of your team, was he responsible for a specific customer within that financial vertical?
> A.  Yes.  <u>He was assigned JP Morgan Chase.</u>

Doc. 44, p. 20 (emphasis supplied).

Mr. Raymond also acknowledged that he told Jacobs to spend all of his time and effort on Chase:

> Q. So very shortly after Securitas took over at Kratos, he was told to focus on JP Morgan Chase alone, one customer?
> A. His client base consisted of JP Morgan Chase.

Doc. 44, p. 43.

Thus, after Securitas acquired Kratos, Jacobs was only permitted to sell to Chase, i.e., Chase was Jacobs' assigned market area.  Presumably, the only bank Jacobs was earning

10

commissions on was Chase. Securitas' assertion that Jacobs' "assigned market area" under Paragraph F.4 of the Agreement was the 20-25 banks in the national financial vertical is not supported by the Agreement and is contrary to the undisputed evidence. Moreover, if the term were defined as Securitas contends, it would be unreasonable and the Court would be required to modify it. *First Energy Solutions*, 521 Fed. App'x 521, 526.[10]

In short, Securitas has not shown a likelihood of success on the merits of its argument that Jacobs' "assigned market area" under Paragraph F.4 is all 20-25 banks in Securitas' national financial vertical. Therefore, with the exception of Chase, Securitas is not entitled to relief enjoining Jacobs from working with any of the 20-25 banks. *See Louisiana-Pacific Corp.*, 928 F.3d at 517 ("a court must not issue a preliminary injunction where the movant presents no likelihood of merits success."). Jacobs is currently restricted from soliciting work from Chase under the TRO issued by this Court and the evidence shows that he is not breaching the Agreement because he is not soliciting work from Chase.

### 4. Paragraph F.5: Securitas has not shown that Jacobs obtained proprietary information about customers in its national financial vertical other than Chase.

Securitas also contends that Jacobs is violating Paragraph F.5 of the Agreement, which provides:

> Non-Solicitation of Customers. If the Associate's duties . . . involve selling . . ., then for a period of one (1) year following the Associate's termination of employment from the Company, . . . the Associate shall not: (a) directly or indirectly solicit, or assist others in soliciting business from any Restricted Customer . . . .

Joint Ex. 5, pp. 4-5.

"Restricted Customer" is defined as:

---

[10] In addition, if there were any ambiguity as to whether the term "assigned market area" means something other than the customers and potential customers that an employee is actually assigned to sell to, that ambiguity would be construed against the drafter, Securitas. *See, e.g., Cadle v. D'Amico*, 66 N.E.3d 1184, 1189-1190 (Oh. Ct. App. 2016).

11

>any actual or prospective customers of the Company or its Related Companies to which, at any time in the twelve (12) months preceding the Associate's last day of employment. . . . , (iii) about which the Associate obtained proprietary information.

Joint Ex. 5, p. 5.

>"Proprietary Information" is defined as:

>[I]information possessed by the Company . . . that is not generally known publicly and that has value, gives the Company or its Related Companies a competitive advantage or otherwise qualifies as a "trade secret" under applicable laws. . . . Proprietary Information will generally include . . . competitive intelligence, supplier names and data, customer information, business strategies, . . . quotations, discounts, data compilations, items marked as "confidential", "secret", "proprietary", or "privileged", and any other information the Company has not publicly disseminated. . . . .

Joint Ex. 5, p. 3.

Securitas says Jacobs learned "proprietary information about how Securitas obtained or was implementing strategies to obtain business from the national financial market, including aggressive pricing strategies, service contract structuring, and subcontractor-delivery methods used by Securitas for PNC and Bank of America." Doc. 47, p. 13. This bars Jacobs, according to Securitas, from soliciting any of the national banks within Securitas' national financial vertical for a period of one year. Securitas asserts that Jacobs is violating Paragraph F.5 because he is currently soliciting business from PNC in competition with Securitas. Doc. 47, p. 13.

Jacobs testified, and Securitas does not dispute, that while employed by Securitas, he never sold to PNC (or any bank in Securitas' national financial vertical other than Chase). Doc. 44, pp. 45, 136-139. It is also undisputed that Jacobs is currently soliciting work from PNC on behalf of Convergint. What is disputed is whether Jacobs received proprietary information about PNC (or any banks in Securitas' national financial vertical other than Chase) while he was employed by Securitas.

As discussed more fully below, Securitas has failed to meet its burden of establishing by clear and convincing evidence its entitlement to injunctive relief based on its contention that

Jacobs received proprietary information about banks other than Chase within its national financial vertical. Raymond vaguely described the alleged proprietary information as "the secret sauce," a description that Securitas also uses in its post-hearing brief. Doc. 44, p. 30; Doc. 47, p. 2. But Securitas' evidence and argument as to strategies other than pricing is devoid of specifics and its evidence as to pricing establishes that the information regarding Securitas' pricing for PNC was given to Securitas' pricing group,[11] not to Jacobs

### a. Pricing

Securitas' evidence that Jacobs was given proprietary pricing information relates solely to PNC. Raymond explained how Securitas' pricing for PNC was used in developing the pricing that Jacobs was to propose to Chase:

> [B]ecause [Jacobs] was new to the team and we had just rolled out our pricing tool to him, he was using -- he needed help to put these prices together. So I connected with him with our engineering team that put these packages and prices together for him that he had access to and they modeled that after our PNC packages.
>
> Q. Is that a pricing tool that you're referring to that was modeled or something else?
>
> A. Our estimating team put together the pricing for these ATMs, provided it to Wes, because he didn't know to use the system very well, and it was modeled after our PNC pricing, you know, as it relates to margins and installation hours and how long it's going to take. There is a whole bunch of stuff that kind of gets in there to come up with a final price. But they used a very similar model to PNC.
>
> Q. And did Mr. Jacobs know that this was based on the PNC model?
>
> A. Yes. That's the discussions, that Matt Sullivan, Wes Jacobs and myself had.

Doc. 44, pp. 24-25. [12]

This testimony shows that, while Jacobs was aware that pricing to another bank may have been used as a model for the pricing he was given to propose to Chase, he did not actually

---

[11] Securitas' pricing group is the Center of Excellence located in New York. Doc. 44, pp. 100-101, 127.

[12] Matt Sullivan, Securitas' Director of National Accounts, confirmed that the pricing group within the Center of Excellence is responsible for developing pricing. Doc. 44, p. 100.

receive the PNC pricing information. Rather, the PNC pricing information was given to personnel within the Center of Excellence, who used it as a model to develop pricing for the Chase ATM project. See also Doc. 44, pp. 37-38 (Securitas' estimators sent Jacobs paperwork for Chase after being directed to model the Chase estimates after PNC).

### b. Other Strategies

Securitas cites the following portion of Raymond's testimony as evidence of other strategies shared with Jacobs (Doc. 47, p. 13):

> Q: ....When you spoke with Mr. Jacobs about growing that JPMC [Chase] account, what kind of information did you exchange with him?
>
> A: Well, we shared lots of information as it relates to some of our other premier accounts on sort of our strategies on systems and services that we would provide, how we would structure certain service contracts and pricing, how we would support those accounts and how we would build out a team to support those accounts.
> ***
> Q: So what kind of specific information about those other successes did you give to Mr. Jacobs?
>
> A: [W]e had an opportunity that Wes uncovered with JPMC for DVR [camera recorder] upgrades in a lot of our ATM locations....They had a fleet of I don't know maybe eight or nine thousand ATMs across the country. This was in the October or November timeframe of 2018, just about when he came to my team. So myself, Matt Sullivan and Wes talked very specifically about how we perform these types of services for PNC, specifically, because we were doing a similar roll out to maybe 5,000 or so locations across the country. We talked about how we priced it for PNC, how we packaged the services, how we supported the installation. Those were direct conversations with him as it relates to another specific account, obviously very sensitive information.

Doc. 44, pp. 22-24.

Raymond testified that he also put Jacobs in touch with two of Securitas' account managers who had been successful in growing business with other banks:

> I also connected him directly with the PNC account manager and the Bank of America account managers to discuss their business and how they conduct business because I wanted to model JPMC [Chase]. JPMC is large. It's like a Bank of America. The amount of business and support and what you need to build out for this customer is like Bank of America and PNC and I wanted to model that. And being new to our company, new to sort of the financial vertical, he wasn't aware of all of this stuff. I had to get him involved

14

> with other folks that he could be aware of this and then model it for him so that he could then go to implement it at JPMC.

Doc. 44, p. 26.

The evidence regarding strategy information Securitas says was shared with Jacobs is not sufficiently specific to meet its burden to prove that it constitutes proprietary information as defined in the Agreement.[13] The pricing information regarding PNC was not given to Jacobs but to estimators who used it to develop pricing for Chase. Thus, Securitas has not met its clear and convincing burden of proof to establish that Jacobs is using proprietary information in violation of Paragraph F.5 of the Agreement.

### 5. Paragraph E.3: Jacobs' suggestion of a provider to Convergint/PNC

Securitas claims that Jacobs is violating the Agreement's "confidentiality restriction" (Doc. 47, p. 13). Securitas appears to be referring to Paragraph E.3, which provides:

> Non-Disclosure. . . . [T]he Associate agrees not to directly or indirectly, either during employment with the Company or thereafter, use or disclose Proprietary Information to or for the benefit of any person not authorized by the Company to receive or benefit from such Proprietary Information . . . .

Joint Ex. 5, p. 4. Securitas says that Jacobs is using and disclosing information about a service provider that "he gained experience and knowledge about" through his work with Chase while at Securitas. Doc. 47, p. 13. As described above, when selling a security solution or system, Securitas bundles hardware, software and services from a number of providers into a package. The provider was part of the security system sold by Jacobs to Chase while he was employed by Securitas. Jacobs suggested by email that Convergint include the provider as an option in its proposal to PNC.[14] Def. Ex. 31.

---

[13] Nor did Securitas attempt to provide evidence as to information allegedly provided to Jacobs regarding any banks in the national financial vertical other than PNC.

[14] Prior to Jacobs' suggesting the provider, Convergint was not planning to include it in the options offered to PNC due to someone's negative experience with it.

15

Notably, Securitas does not argue that information regarding the provider was information proprietary to it. Rather, Securitas misuses Jacobs' use of the word "privileged" in his deposition testimony to attempt to fit the provider information within Paragraph E.3. In using the term "privileged" during his deposition, Jacobs indicated that the provider information may be considered confidential by Chase because Chase might not want others to know who it is using as a provider. Doc. 44, p. 170. Jacobs did not testify that the information was privileged or proprietary to Securitas. Jacobs also testified, and his testimony is not disputed by Securitas, that he became familiar with the provider "years and years ago," i.e., before the Chase project, and that the provider was the largest of its kind in the world. Doc. 44, pp. 167-170.

Even if Jacobs' email to Convergint could be read to show that Jacobs based his recommendation on his experience with the provider while employed by Securitas, Securitas has not shown by clear and convincing evidence that the name of a service provider, a prominent leader in the industry that Convergint was also aware of, is Securitas' proprietary information. Jacobs did not testify that he disclosed to Convergint that Chase used the provider or anything that Securitas may have done with respect to using the provider. He merely opined, in an email to Convergint, that Convergint should include the provider in a list of three options to offer PNC. See Def. Ex. 31. Securitas has not showed by clear and convincing evidence that the name of the provider is confidential or proprietary to it, a prerequisite to establishing a violation of Paragraph E.3.

### B. Preliminary injunction factors

As set forth in the TRO Order, Securitas has shown a likelihood of success on the merits with respect to the restrictions set forth in the TRO. Securitas has also demonstrated that it will suffer irreparable harm if the relief previously granted in the TRO is not maintained. In addition, it has established that there will be no substantial harm to others caused if the TRO relief TRO

remains in place. *See FirstEnergy Solutions Corp.*, 521 Fed App'x 521, 529 (finding no harm to the employee who signed the non-compete agreement because he did so with full awareness of the limitations it contained). Finally, the public interest weighs in favor of Securitas with respective to the relief granted in the TRO. *Id*. ("[T]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts," citing *National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 891 (N.D.Ohio 1996)).

As detailed above, Securitas has not shown a likelihood of success on the merits as to its contention that the relief granted in the TRO should be expanded by enjoining Jacobs from selling to the 20-25 banks in Securitas' national financial vertical other than Chase, including PNC. Therefore, Securitas is not entitled to the expanded injunctive relief it now seeks. *See Louisiana-Pacific Corp.*, 928 F.3d at 517 ("a court must not issue a preliminary injunction where the movant presents no likelihood of merits success.").

Summary: The undersigned recommends that the Agreement be found enforceable and that Jacobs be enjoined from:

> disclosing or utilizing any proprietary information, as defined in the parties' agreement, that he learned during his employment with Securitas or its predecessor, Kratos;
>
> communicating or assisting others in communicating with any customer of Securitas as to which Jacobs had any sales or client relations responsibility during the last 12 months of his employment with Securitas or its predecessor;
>
> communicating or assisting others in communicating with any entity that was a prospective client of Securitas or its predecessor during Jacobs' last 12 months of employment and as to which Jacobs was assigned responsibility for soliciting business or for assisting others in doing so; and
>
> directly or indirectly soliciting or inducing any employee, officer, or agent of Securitas, or any of its Related Companies, to terminate employment therewith.

Doc. 17, pp. 6-7.

17

Specifically, while at Convergint, Jacobs may not work with J.P. Morgan Chase or any of the former customers he had during the last year of his employment with Kratos/Securitas, whom he identified at the hearing. Doc. 44, pp. 136-139. Because Securitas has not shown that Jacobs has proprietary or confidential information for customers in Securitas' national financial vertical other than Chase, it is not entitled to enjoin Jacobs from performing work with the remaining banks in Securitas' national financial vertical.

## V. Conclusion

For the reasons explained above, the undersigned recommends that the Court grant in part and deny in part Securitas' Motion for PI; Securitas is entitled to enjoin Jacobs in the manner set forth in the Court's TRO. It is not entitled to a finding that Jacobs is currently violating the Agreement or the TRO.

Dated: July 30, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).