# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WESLEY JACOBS, | ) | CASE NO. 5:19-CV-466 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | PRELIMINARY INJUNCTION |
| | ) | ORDER |
| SECURITAS ELECTRONIC SECURITY, | ) | |
| INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter comes before the Court upon the Report and Recommendation ("R&R") of Magistrate Judge Kathleen B. Burke recommending that the Court grant in part the motion for a preliminary injunction filed by defendant Securitas Electronic Security, Inc. ("Securitas") (Doc. No. 51 (R&R); *see* Doc. No. 5 (Motion for Preliminary Injunction ["Mot."])). Securitas filed objections to the R&R (Doc. No. 57 ["Obj."]), plaintiff Wesley Jacobs ("Jacobs") responded to the objections (Doc. No. 58 ["Res."]), and Securitas filed a reply (Doc. No. 59 ["Reply"]).

The Court has reviewed the R&R, the record, and the parties' submissions. The Court finds, and the parties do not dispute, that the magistrate judge applied the proper standard for consideration of a request for preliminary injunctive relief, and further identified the governing law relating to restrictive employment agreements. Accordingly, the Court shall limit its *de novo* review to the specific written objections to the R&R. *See generally Massey v. City of Ferndale*, 7 F.3d 506 (6th Cir. 1983).

## I. BACKGROUND

In the underlying matter, Jacobs brought suit against Securitas, his former employer, seeking a declaration that the Restricted Covenant Agreement ("RCA") signed by the parties during Jacobs' employment with Securitas was invalid and did not in any way impinge upon his ability to work for his new employer, Convergint Technologies LLC ("Convergint"). (Doc. No. 1 (Complaint ["Compl."]); *see* Doc. No. 1-1 (RCA).) Jacobs also sought to recover damages for commissions he claimed were earned by him but unpaid by Securitas. (Compl. ¶¶ 46, 50.) Securitas subsequently moved for a temporary restraining order ("TRO") and a preliminary injunction to enforce the RCA.

On May 6, 2019, the Court issued a TRO enjoining Jacobs from (1) disclosing Securitas' proprietary information, (2) communicating with any of Securitas' customers that he had sales or client relations responsibility during the last 12 months of his employment with Securitas, (3) communicating with or soliciting business from any prospective client of Securitas to which Jacobs was directed to solicit or cultivate while at Securitas, and (4) soliciting any of Securitas' employees. (Doc. No. 17 (Memorandum Opinion and TRO ["TRO MO"]) at 184–85.[1])

Following the filing of the TRO, the Court referred this matter to the magistrate judge for a hearing on the preliminary injunction motion and the preparation of an R&R. (Doc. No. 18 (Order of Referral).) The magistrate judge conducted an evidentiary hearing on June 13, 2019, at the conclusion of which she granted the parties leave to submit post-hearing briefs. (*See* Doc. No. 46 (Securitas' Post-hearing Brief); Doc. No. 47 (Jacobs' Post-hearing Brief).) In the R&R

---

[1] All page numbers refer to the page identification number generated by the Court's electronic docketing system.

that followed, the magistrate judge rejected Securitas' argument that the term "assigned market area" in the RCA for which Jacobs could not compete upon termination referred to the 20–25 national banking institutions in Securitas' "national financial vertical." (R&R at 618–19.) She also found that Securitas had not shown that Jacobs violated the RCA by using Securitas' proprietary information while working for Convergint. (*Id*. at 619–23.) Ultimately, the R&R recommended that the Court issue a preliminary injunction prohibiting Jacobs from violating the terms of the RCA by engaging in conduct similar to that prohibited by the terms of the TRO, with the exception that it limited the non-compete restriction by prohibiting Jacobs from working with any of the former customers he had during the last year of his employment with Kratos/Securitas, whom he identified at the hearing. (*Id*. at 625–26.)

The facts have already been addressed in numerous opinions and orders, and the Court will assume familiarity with these prior rulings and provide only limited factual and procedural background as needed in the discussion section of this memorandum opinion and order to properly frame the outstanding objections.

## II. DISCUSSION

### A. Securitas' Objections

In its first objection, Securitas complains that the R&R unduly restricted the "assigned market area" identified in the RCA by not including all of the 20–25 banks Securitas identified were part of a collection of financial institutions serviced or targeted by Securitas employees assigned to a sales group known as the "national financial vertical." Briefly, Jacobs was employed by Kratos until it was purchased by Securitas in 2012, at which time Jacobs became an employee of Securitas. It is undisputed that Jacobs has enjoyed a business relationship with JP

Morgan Chase since at least 1999, and shortly after he became a Securitas employee he was assigned to the national financial vertical.

The RCA restricted Jacobs from competing with Securitas within his "assigned market area" where Securitas had or was seeking a presence and in which Jacobs "had any responsibility during the last two (2) years" of his employment with Securitas. (RCA § F.4.) Because Jacobs was assigned to the "national financial vertical," Securitas argues that the magistrate judge erred in concluding that Securitas had not shown a likelihood of success on the merits relative to its request that Jacobs be enjoined from selling security solutions to all of the financial institutions within the national financial vertical. (Obj. at 641–42.)

As the magistrate judge properly observed, the term "assigned market area" is not defined in the RCA. (R&R at 618.) Securitas underscores the fact that Jacobs admitted that he was part of the national financial vertical, which, as a group, serviced the top banking institutions on a nationwide basis. But Securitas concedes, as it must, that Jacobs only serviced one account within the national financial vertical—JP Morgan Chase. (No. 44 (Transcript from Preliminary Injunction Hearing ["TR"]) at 381, 404, 406, 457, 458, 474, 486.) Securitas argues that, "[e]ven though [Jacobs] serviced one account, [JP Morgan Chase], his market as assigned to him by Rob Raymond, Securitas's senior vice president of sales, was the national financial vertical." (Obj. at 642.)

This argument ignores the evidence at the hearing that, while the national financial vertical may have encompassed dozens of national banks, Jacobs was assigned to service just one. (*Id*. at 404 [Jacobs' "client base consisted of JP Morgan Chase."], 406 [identifying an email advising Jacobs that "Your focus is 100 percent on JP Morgan Chase and retail."].) In fact,

Securitas' own employees testified at the hearing that Jacobs was brought over to the national financial vertical because of his relationship with JP Morgan Chase. (TR at 458.) Indeed, when asked about the directive Jacobs received to focus his energy on JP Morgan Chase, Matthew Sullivan, Director of National Accounts, replied: "Well, [Jacobs] did come to the banking team to handle Chase." (*Id*. at 474.)

Courts generally look upon covenants not to compete with skepticism and have cautiously considered and scrutinized them. *See MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 (N.D. Ohio 2009) (citing *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 340 (Ohio Ct. App. 1997)); *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004); *see also Brentlinger Enters. v. Curran*, 752 N.E.2d 994, 998 (Ohio Ct. App. 2001) (noting that because a non-compete clause necessarily restrains trade, such clauses will only be enforced to the extent they are reasonable). Given this inherent reluctance to expand the scope of such agreements, and in light of the record as it stands at this point in the litigation, the Court agrees with the magistrate judge that Securitas has not demonstrated with clear and convincing evidence that the undefined term "assigned market area" referred to the 20–25 banks in the national financial vertical.[2] Instead, the magistrate judge properly limited *Jacobs*' assigned market area, as Securitas appears to have done, to JP Morgan Chase and the other clients Jacobs identified in the hearing to which he had contact. Securitas' first objection is

---

[2] In its objection Securitas does not address the fact that, even if it could successfully advocate for a broader reading of the term "assigned market area," the Court would still have the option to modify the restriction if it was otherwise unreasonable. *See PolyOne Corp. v. Kutka*, 67 F. Supp. 3d 863, 871 (N.D. Ohio 2014) (noting that "Ohio law imposes the burden on the employer to prove the restraint is reasonable and further affords courts the power to modify a restraint that is not reasonably necessary to protect the employer's legitimate business interests and then enforce the covenant as modified") (citing *Mattimoe*, 648 F. Supp. 2d at 963). If forced to rule on the merits at this time, it would be difficult to find Securitas' proposed construction reasonable, since it would impose an undue hardship on Jacobs, who has spent his entire career working in this specialized industry soliciting and servicing national financial banking institutions. (TR at 478–79, 533.)

overruled.

Securitas also takes exception to the magistrate judge's conclusion that Jacobs did not breach the RCA by using proprietary information about customers in its national financial vertical other than JP Morgan Chase. At this point in the proceedings, there appears to be no dispute that while Jacobs might have received proprietary information regarding JP Morgan Chase, he has not used that information to pursue JP Morgan Chase on behalf of Convergint. (TR at 495.) Still, Securitas complains that Jacobs was also given access to proprietary information relating to other national banking accounts and that he used this information to solicit business from these banking institutions for Convergint.

At the hearing, Robert Raymond, Senior Vice-President of Financial Sales, testified that "I believe [Jacobs] had strategy information. I believe he had pricing information. I believe that he had sort of the secret sauce information of how we support these accounts and grow them out that I think is unique to [Securitas]. I believe that he had much of that information or even had access to it." (TR at 391.) But when pressed for specifics, Raymond and the other Securitas witnesses could only point to documents that were *created from and modeled after* purported proprietary information involving PNC Bank.[3] (TR at 399, 461–62, 488.) While the RCA prohibits Jacobs from soliciting certain customers using Securitas' proprietary information (*see* RCA at § F.5), it does not define the term "proprietary information" broadly enough to include information and documents modeled after proprietary information. (*See id*. at § E.1.)

Securitas witnesses also testified generally as to biweekly team phone conferences and

_____

[3] To assist Jacobs in pitching a new project to JP Morgan Chase, proprietary pricing information relating to a similar project for PNC Bank was given to a group in Securitas known as the Center of Excellence. (TR at 461–62, 488.) This group utilized the information to develop a model that Jacobs could use for pricing for the JP Morgan Chase project. (*Id*.) There is no dispute that the information utilized by this group was never shared directly with Jacobs.

national sales meetings Jacobs attended and/or participated in where pricing and strategy for various customers *may have been* discussed. (TR at 388, 459–60, 472.) They were unable, however, to identify any specific proprietary information that Jacobs received during these events that he may have used to solicit Securitas' customers on behalf of Convergint.[4] Accordingly, the magistrate judge correctly determined that Securitas did not meet its burden of demonstrating by clear and convincing evidence that Jacobs had breached the RCA. Securitas' second objection is overruled.

### B.     Jacobs' Objection

In his response to Securitas' objections, Jacobs invites the Court to find that the RCA is unenforceable because Securitas breached the agreement by failing to pay him his earned commissions, an argument rejected by the magistrate judge. (Res. at 650; *see* R&R at 615–16.) Securitas complains that this argument represents an untimely objection to the R&R. (Reply at 661.)[5] The Court agrees and for this reason the objection is overruled. (R&R at 626 (allowing 14 days to file objections); *see also* Fed. R. Civ. P. 72(b)(2) (requiring all objections to an R&R to be filed within 14 days after being served with a copy). But even if the Court were to consider this "objection" on the merits, it would fail.

Following the referral, the magistrate judge permitted the parties to engage in limited expedited discovery in advance of the preliminary injunction hearing. (R&R at 616.) Jacobs

---

[4] The only specific documents identified by Securitas' witnesses were the daily business reports that Jacobs and other members of the national financial vertical received, setting forth the total dollar amount billed to each client. (TR at 465–67.) Even if these documents constitute proprietary information, it is entirely unclear at this stage in the proceedings how this raw data, devoid of details regarding the nature of the projects billed, could be used by *any* salesperson to solicit customers away from Securitas. (*See id.* at 469–71.)

[5] Ordinarily, the Court would not permit a reply brief in support of a party's objections. However, given Jacobs' improper attempt to backdoor an untimely objection, the Court found it appropriate to consider the filing.

identified over 200 jobs for which he believed that he did not receive his full commissions due, and the magistrate judge permitted him to select 25 of those jobs and obtain all relevant documentation regarding these assignments. (*Id*.) Based upon this discovery, it was determined that Securitas failed to pay Jacobs approximately $4,700 in commissions, or about 1.2% of the commissions he actually earned over the period covering these jobs. (*Id*. at 617; TR at 444.) The magistrate judge concluded that this evidence demonstrated, at least at this stage in the proceedings, that Securitas substantially performed under the RCA, and that any shortfall in its payment of commissions did not "rise to the level of a material breach that would preclude Securitas from enforcing" the RCA. (R&R at 617.)

Jacobs complains that the magistrate judge unfairly limited him to discovering information relating to only 25 of the over 200 jobs he identified during the expedited discovery period. Given that the discovery established that Securitas failed to pay at least a portion of the total amount owed on each of the 25 jobs, he claims that further discovery on the other jobs would have uncovered additional shortfalls and the total dollar amount improperly withheld "would be significantly higher." (Res. 658–59.) But it stands to reason that Jacobs would have selected the jobs that he believed would reveal the greatest amount of withheld commissions. Given that the jobs Jacobs selected yielded only minimal unpaid commissions, the magistrate judge did not err in refusing to speculate that the jobs he did not select would have uncovered significantly more unpaid commissions. (*See* R&R at 617.)

In any event, there is no reason to believe that additional discovery would have yielded evidence to support the conclusion that "the company acted in bad faith in failing to fully compensate [Jacobs] while he was still an employee." *See Berk Enters., Inc. v. Polivka*, No.

2012-T-0073, 2013 WL 6019608, at *5 (Ohio Ct. App. Nov. 12, 2013). As the authority Jacobs relies upon makes clear, "[w]here there has been an honest effort by the [employer] to perform, *and not a willful omission*, substantial performance is all that is required." *S. Tex. & Lone Star Drywall, Inc. v. Young*, No. 77AP-140, 1977 WL 200617, at *2 (Ohio Ct. App. Dec. 6, 1977) (quotation marks and citation omitted) (emphasis in original). At the hearing, Raymond testified that it would never have been the company's intent to deprive Jacobs of any earned commissions (TR at 409–10), and Jacobs points to nothing in the discovery relating to his hand selected jobs (all of which were jobs he performed while still working for Kratos) that revealed any evidence that Securitas acted in bad faith in withholding any earned commissions. *See, e.g., Berk Enters.*, 2013 WL 6019608, at *5 (rejecting argument that employer's shortfalls in paid commissions invalidated a non-compete agreement where "the evidence . . . supports the conclusion that the failure to fully compensate [the employee] for his work was due solely to the company's basic [calculation] error . . . and not a situation which the company's officers purposely tried to withhold compensation").

## III. Conclusion

Based upon the record at this stage in the proceedings, the Court finds that the balance of the relevant factors favors the issuance of a preliminary injunction as set forth below. The parties' objections are overruled, the R&R is adopted, and Securitas' motion for a preliminary injunction is granted in part.

Accordingly, it is ordered that Jacobs is preliminarily enjoined from:

> disclosing or utilizing any proprietary information, as defined in the RCA, that he learned during his employment with Securitas or its predecessor, Kratos;

communicating or assisting others in communicating with any customer of Securitas as to which Jacobs had any sales or client relations responsibility during the last 12 months of his employment with Securitas or its predecessor;

communicating or assisting others in communicating with any entity that was a prospective client of Securitas or its predecessor during Jacobs' last 12 months of employment and as to which Jacobs was assigned responsibility for soliciting business or for assisting others in doing so; and

directly or indirectly soliciting or inducing any employee, officer, or agent of Securitas, or any of its related companies, to terminate employment therewith.

Specifically, Jacobs may not work with J.P. Morgan Chase or any of the former customers he had during the last year of his employment with Kratos/Securitas, all of whom he identified at the preliminary injunction hearing. (*See* TR at 497–500.) Because Jacobs remains employed by Convergint in a non-competing capacity, the Court finds that a bond is not necessary.

**IT IS SO ORDERED**.


Dated: September 26, 2019

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**